**12-2249-cr**
**United States v. Rosen**



**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**


August Term, 2012

(Argued: November 28, 2012                                    Decided: May 29, 2013)


Docket No. 12-2249-cr


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

    Appellee,

      v.

DAVID ROSEN,

    Defendant-Appellant,

CARL KRUGER, RICHARD LIPSKY,
AARON MALINSKY, MICHAEL TURANO,
SOLOMON KALISH, ROBERT AQUINO,
WILLIAM BOYLAND, JR.,

    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


Before: SACK, CHIN, and LOHIER, <u>Circuit Judges</u>.

    Defendant-appellant David Rosen appeals from a judgment of the United States District Court for the Southern District of New York (Rakoff, <u>J.</u>).  Rosen was convicted of honest services mail and wire fraud and conspiracy to commit bribery for paying sham consulting fees to current and former members of the New York State Assembly, and for agreeing to award business to a third-party company in which a former New York State Senator had a financial interest, all in order to obtain a commitment from these State legislators to perform unspecified

official acts as the opportunities arose.  Rosen contends that the Government's "as opportunities arise" theory of quid pro quo bribery is unconstitutionally vague as applied to his conduct, that the evidence was insufficient to prove the corrupt intent element of the offenses, and that the District Court erred when it denied his motion to compel the Government to provide defense witness immunity to his former counsel.  We AFFIRM.

> ELKAN ABRAMOWITZ (James R. Stovall, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY; E. Scott Morvillo, Ellen M. Murphy, and Robert C. Morvillo, Morvillo LLP, New York, NY, *on the brief*), Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY, *for Defendant-Appellant*.
>
> MICHAEL BOSWORTH, Assistant United States Attorney (Glen G. McGorty and Katherine Polk Failla, Assistant United States Attorneys, Preet Bharara, United States Attorney for the Southern District of New York, *on the brief*), New York, NY, *for Appellee*.

LOHIER, <u>Circuit Judge</u>:

The corruption of elected officials undermines public confidence in our democratic institutions.  The Government has a wide berth to combat it.  One of the Government's more recent public corruption targets was David Rosen, the former Chief Executive Officer of MediSys Health Network ("MediSys") and its associated hospitals, whom the Government charged with participating in bribery schemes involving three New York State legislators: former Assemblyman Anthony Seminerio, Assemblyman William Boyland, Jr., and former Senator Carl Kruger.  Rosen was convicted, after a bench trial in the United States District Court for the Southern District of New York (Rakoff, <u>J.</u>), of honest services mail and wire fraud and honest services fraud conspiracy, in violation of 18 U.S.C. §§ 1341, 1343, and 1346, as well as conspiracy to commit bribery and violate the Travel Act, in violation of 18 U.S.C. § 371.  At

1    trial, there was evidence that Rosen bribed the three legislators in exchange for their

2    commitment to perform official acts "as specific opportunities arose" within the New York State

3    legislature and State agencies.

4         On appeal, Rosen makes three principal arguments.  First, he disputes the Government's

5    "as opportunities arise" theory of prosecution: he contends that his conduct was not criminal and

6    that the federal bribery and honest services fraud statutes are unconstitutionally vague as applied

7    to his conduct.  Second, he asserts that the trial evidence against him was insufficient to show

8    beyond a reasonable doubt that he acted with any corrupt intent.  Third, he challenges the

9    District Court's refusal to compel the Government to immunize a potential defense witness.  We

10   reject all three arguments and affirm the judgment of the District Court.

11                                              **BACKGROUND**

12        Because Rosen appeals from a judgment of conviction following trial, we view the facts,

13   which are drawn from the trial evidence, in the light most favorable to the Government.  See

14   United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012).

15        1. David Rosen

16         Rosen was the CEO of MediSys, a not-for-profit company that managed several "safety-

17   net" hospitals in the New York City area, and of three New York-based hospitals in the MediSys

18   network: Jamaica Hospital Medical Center and Flushing Hospital Medical Center in Queens, and

19   Brookdale University Hospital and Medical Center ("Brookdale Hospital") in Brooklyn.

20   Because the MediSys hospitals served primarily underinsured and indigent patients, they

21   depended significantly on funding from New York State and on New York's Medicaid

22   reimbursement rates.  The MediSys network likewise depended on State support to acquire other

1    hospitals.  Rosen actively promoted MediSys with State officials, lobbying New York State and

2    its agencies to advance MediSys's interests.

3             2.  <u>Anthony Seminerio</u>

4             Anthony Seminerio served as an Assemblyman for New York State's 31st Assembly

5    District from 1979 through 1992, and as an Assemblyman for the 38th Assembly District from

6    1993 through 2009, when he resigned.  As an Assemblyman, Seminerio supported Jamaica

7    Hospital by securing State financial assistance for the hospital.  For example, in 1985 Seminerio

8    sponsored legislation that created a capital financing program through which Jamaica Hospital

9    obtained over $100 million to construct a new facility.

10           In the late 1990s, pursuant to two self-described "consulting" contracts, MediSys hired

11    MARC Consultants ("MARC"), a consulting company founded and controlled by Seminerio.  At

12    Rosen's request, MediSys entered the first contract with MARC in 1998; the contract provided

13    that Neighborhood Health Providers ("NHP"), a managed care entity partially owned by

14    MediSys, would hire MARC for a monthly fee of $1,500.  During the contract negotiations,

15    George Kalkines, a partner at MediSys's outside general counsel, Kalkines Arky Zall &

16    Bernstein, falsely told NHP's CEO that the consulting agreement had been or soon would be

17    reviewed by New York State's Legislative Ethics Committee (the "LEC").  The second contract,

18    signed by David Rosen on behalf of Jamaica Hospital and by MARC in April 1999, was

19    essentially identical to the NHP-MARC contract but required higher monthly payments of

20    $3,333.33 to MARC.  Ultimately, from 1999 to 2008, MediSys paid MARC over $410,000 in

21    fees under both contracts.  While the contracts required MARC to provide "assistance with

22    respect to marketing, public relations and contractual relationships," including "appearing before

4

1    or meeting with governmental agencies or units and private parties," each contract also explicitly

2    prohibited MARC from providing "any consulting services in respect of any unit or agency of

3    the State of New York, including the state legislature."

4        As the District Court observed, "[t]hese contracts, on their face, were not necessarily

5    unlawful." Indeed, after April 1999, Seminerio appears to have provided some appropriate

6    assistance to MediSys under the contracts. For example, using his relationships in the private

7    sector and in the local and federal governments, Seminerio petitioned the New York City Fire

8    Department to expand the number of ambulance districts that MediSys hospitals could cover,

9    facilitated MediSys's application to the United States Department of Housing and Urban

10    Development for mortgage financing, and notified MediSys when various properties in which it

11    might be interested became available for purchase.

12        However, Seminerio also violated the contracts' prohibition against lobbying State

13    entities by directly exploiting his official position and assisting MediSys before the State

14    legislature and various State agencies. In March 1999, for example, Seminerio wrote a letter on

15    State Assembly letterhead stationery to the New York State Senate Majority Leader asking him

16    to restore millions of dollars in funding to the hospital indigent care pool, an important source of

17    funding for Jamaica Hospital. In 2006 Seminerio co-sponsored legislation in the Assembly

18    specifically to allow Jamaica Hospital to restructure its debt so that MediSys could acquire more

19    hospitals. In addition, Seminerio lobbied the Speaker of the Assembly regarding MediSys's

20    participation in a long-term managed care program, and set up a meeting between Rosen and the

21    Governor's chief of staff to discuss debt relief for certain MediSys hospitals. In 2008 Seminerio

22    submitted a $100,000 funding letter request for the MediSys hospitals, sought approval for

5

1    MediSys to acquire two financially ailing hospitals, and urged the Speaker of the Assembly to

2    reject budget cuts that would have disadvantaged the MediSys hospitals.

3         At every relevant turn, Rosen concealed MediSys's consulting arrangements with

4    Seminerio.  He did not tell Joann Ariola, MediSys's Director of Intergovernmental Affairs, that

5    Seminerio had been hired as a consultant, even though Ariola served as a "liaison with

6    government officials . . . and quasi-government agencies" for MediSys.  He failed to tell

7    MediSys's Board of Directors about the NHP-MARC contract.  Nor did Rosen disclose the

8    existence of either contract on disclosure forms that MediSys was required to complete in order

9    to be eligible to enter into contracts with New York City and New York State.  New York City's

10   Vendor Information Exchange System ("VENDEX") questionnaire explicitly asked, "Are there

11   any individuals now serving in a managerial or consulting capacity . . . who now serve, or within

12   the past five (5) years have served as . . . an elected or appointed official or officer?"  Rosen

13   falsely answered "no" to that question on the VENDEX questionnaire that he completed on

14   behalf of Jamaica Hospital in October 2004.  Again, in 2008, Rosen falsely stated on the same

15   form that the only individual connected to MediSys who fit that description was Ariola, a former

16   Assistant Commissioner in the Office of the New York City Mayor.

17         3.  William Boyland, Jr.

18         Boyland has served in the New York State Assembly since February 2003.  Prior to (and

19   after) his election, he was employed as a marketing assistant and outreach coordinator at Urban

20   Strategies, an ambulatory care clinic at Brookdale Hospital.  Urban Strategies expected that,

6

1    given his family's stature in the community,[1] Boyland could "use his presence i[n] the

2    community to try and bring in more patients."  However, Boyland "miss[ed] quite a number of

3    days," it was unclear "what he was doing outside in the community," and he generally "wasn't

4    . . . very productive."

5        Nevertheless, at Rosen's urging, Urban Strategies continued to pay Boyland and, after he

6    was elected to the Assembly, changed Boyland's pay structure so that he would be paid the same

7    amount as a "consultant" that he had been paid as a full-time employee.  In an email exchange in

8    September 2003 with MediSys's Chief Financial Officer and MediSys's General Counsel, Rosen

9    stated that Boyland "needs to come off the payroll [of MediSys] and we will pay him the same

10    money as a consultant."  Rosen added that he would "develop a consulting agreement" and

11    reiterated that Boyland should come "off the payroll so he doesn't have to punch in."  By April

12    2004 MediSys was paying Boyland approximately $35,000 per year as a community outreach

13    consultant and recruiter for Brookdale Hospital.

14        Yet from 2003 to 2009, Boyland failed to provide any material community outreach or

15    recruiting services.  Indeed, none of the MediSys or Brookdale Hospital employees who testified

16    were able to identify any consulting work Boyland had performed or were aware that he was

17    even affiliated with the hospital during that period.  Although Boyland performed little or no

18    consulting work under his contract, he assisted MediSys and Brookdale Hospital in his official

19    capacity as an Assemblyman.  In February 2004 Boyland wrote a letter to the Speaker of the

---

[1]  Boyland's family was well known within the community.  His father, William "Frank" Boyland, Sr., was the Assemblyman for the 55th Assembly District for approximately two decades until Feburary 2003.  Boyland's sister was a member of the New York City Council from 1997 to 2005.

1    Assembly requesting that $3,000,000 be allocated to programs supporting Brookdale Hospital.

2    Three years later, Boyland made a similar funding request to the Assembly to benefit Jamaica

3    Hospital, which was not in his Assembly District.

4         As with Seminerio, Rosen failed to disclose the "consulting arrangement" between

5    Brookdale Hospital and Boyland in the required disclosure forms submitted to New York City

6    and New York State.  In 2004, for example, Rosen completed a VENDEX form on which he

7    falsely denied that any elected or appointed officials were working for Brookdale Hospital in a

8    consulting or managerial capacity.  In 2007 Rosen completed an updated VENDEX form on

9    which he finally disclosed that Boyland was a consultant for Brookdale Hospital.  But even

10   there, Rosen misrepresented that the consulting arrangement had not begun until 2006.  Boyland,

11   too, lied repeatedly about his arrangement with Brookdale Hospital on his annual disclosure

12   forms filed with New York State.

13        4. Carl Kruger

14        From 1994 to 2011 Carl Kruger served as a Senator in the New York State Senate for the

15   27th Senate District.  During that period, Kruger was a partner in a consulting company, Adex

16   Management ("Adex"), together with Michael and Gerard Turano and Solomon Kalish.  In 2007

17   Kruger began pressuring Rosen to award a contract to Compassionate Care Hospice, a company

18   that had hired Adex to help it obtain hospice contracts.  While MediSys was evaluating the

19   potential Compassionate Care contract, Kruger began exploiting his official position and his ties

20   to State government officials to benefit MediSys.  In November 2007, for example, Kruger

21   secured $325,000 in state funding for Brookdale Hospital, which he referenced in a letter to

22   Rosen as "Phase I" of his relationship with MediSys.  In 2008 Kruger secured a $100,000

8

1    equipment grant for Jamaica Hospital and actively supported MediSys's attempt to take control

2    of two financially failing hospitals.  At trial, a Compassionate Care employee testified that she

3    spoke with Kalish about Kruger's efforts to help Compassionate Care get the contract with

4    MediSys by doing "favors for" Rosen.

5          Because of Kruger's interest in Compassionate Care, Rosen ultimately agreed to award it

6    the contract despite objections from other MediSys employees, including MediSys's Chief

7    Operating Officer ("COO").  Rosen told the COO that he was "getting a lot of pressure from

8    Kruger," and that he "ha[d] to do this."  In September 2008 Rosen ordered the contract finalized

9    and instructed the COO to sign it and "give it to Kruger."[2]

10          5.  <u>Procedural History</u>

11          As relevant to this appeal, in connection with the bribes paid to Seminerio, Boyland, and

12    Kruger, Rosen was charged with honest services mail fraud (Count Five) and honest services

13    wire fraud (Count Six), in violation of 18 U.S.C. §§ 1341, 1343, and 1346.  Rosen was also

14    charged with conspiracy to commit bribery and violate the Travel Act, in violation of 18 U.S.C.

15    § 371 (Counts Seven and Nine), in connection with the bribes paid to Seminerio and Boyland,

16    and with honest services fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count Eight), in

17    connection with the bribes paid to Boyland.

18          During an eleven-day bench trial, Rosen sought to show, among other things, that he

19    relied on the advice of counsel – Kalkines – regarding the legality of the consulting agreements

20    with Seminerio and MARC.  Kalkines had been named as an unindicted co-conspirator in the

---

[2]  During this conversation, Rosen told the COO that he wanted to give the finalized contract to Kruger the following week.  In the intervening period, Seminerio was arrested, and the contract was never finalized.

1    indictment and had informed Rosen that he would assert his Fifth Amendment right not to testify

2    if Rosen called him as a witness at trial.  Rosen moved for an order compelling the Government

3    to immunize Kalkines or for dismissal of the pending charges.  The District Court denied

4    Rosen's motion.

5         In September 2011 the District Court issued detailed findings of fact and conclusions of

6    law.  Those findings of fact reflected, "among other things, the [District] Court's assessment[] of

7    the demeanor and reliability of each of the witnesses and the Court's drawing of reasonable

8    inferences from the testimony it found credible and persuasive."  The District Court first

9    addressed the evidence relating to Seminerio, finding that "[b]oth from the way the consultancy

10   was initially handled and from subsequent events, . . . the 'consulting' arrangement was a

11   disguised bribe, necessary to assure Seminerio's legislative support for MediSys."  It further

12   found that the principal purpose of the NHP-MARC and Jamaica Hospital-MARC contracts

13   "was to provide a plausible 'cover' for the bribes Rosen intended to funnel to Seminerio."  After

14   finding that "virtually every service Seminerio rendered for MediSys was undertaken in his

15   capacity as an Assemblyman," the District Court determined that "Seminerio never rendered any

16   material consulting services to MediSys at any time here relevant, and Rosen well knew this."

17   The District Court also found that, "[g]iven Rosen's intimate knowledge of the arrangements

18   with Seminerio, . . . [Rosen's failure to disclose the consulting agreements] w[as] intentional and

19   bespeak[s] an effort on Rosen's part to conceal arrangements with Seminerio that he knew could

20   not bear scrutiny because they were thinly-disguised bribes."

21         Turning to the charges relating to Boyland, the District Court found that "Boyland, Jr. did

22   not perform any material community outreach or recruitment services for Urban Strategies," that

10

1    Boyland had instead "earned the bribe being approved by Rosen by assisting MediSys through

2    official acts taken in his capacity as Assemblyman," and that Rosen had improperly failed to

3    disclose the relationship.  As for Kruger, the District Court found that "Rosen fully agreed to

4    what he clearly knew was a solicitation of a bribe, i.e., an offer of Kruger's official assistance in

5    exchange for Rosen's promise that he would 'get [the Compassionate Care contract] done.'"

6    Furthermore, the court referred to Rosen's decision to stop trying to execute the Compassionate

7    Care contract immediately following Seminerio's arrest as "an act itself reflecting his

8    consciousness of guilt."

9          The District Court concluded that "the evidence has shown, beyond any reasonable

10    dispute, that Rosen conferred benefits, or sought to confer benefits, on Seminerio, Boyland, Jr.,

11    and Kruger in return for acts to be taken in their official capacities," thus satisfying "the quid pro

12    quo requirement" of each of the charges against Rosen at issue on appeal.  It found that "[e]ach

13    of these arrangements, . . . involved a corrupt agreement or conspiracy . . ., into which Rosen

14    entered knowingly, willfully, and with a specific intent to bribe the legislators and thereby

15    deprive their constituents of their honest services."  Based on these extensive factual findings,

16    the District Court convicted Rosen of all the remaining charges and, in May 2012, sentenced

17    Rosen principally to a term of 36 months' imprisonment.

18

19

20

21

22

11

**DISCUSSION**

Rosen's appeal raises three primary issues. First, we consider Rosen's argument that the federal bribery and honest services fraud statutes under which he was convicted were unconstitutionally vague as applied to his conduct.[3] Second, we review whether the Government's evidence was legally sufficient to prove the existence of the requisite quid pro quo arrangements and to support Rosen's convictions beyond a reasonable doubt. Third, we consider whether the District Court erred when it denied Rosen's motion to compel the Government to provide defense witness immunity to Kalkines.

1. <u>Void for Vagueness</u>

Rosen argues that the Government's theory of bribery was unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment because it included conduct that is lawful. Specifically, he urges that (1) the boundaries of the "as opportunities arise" theory are

---

[3]  As we have noted, Rosen was convicted of honest services mail fraud and honest services wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1346, conspiracy to commit bribery, in violation of 18 U.S.C. §§ 666(a) and 1952(a)(3), and honest services fraud conspiracy, in violation of 18 U.S.C. §§ 1341, 1343, and 1346. As relevant here, Sections 1341 and 1343 prohibit "devis[ing] or intending to devise any scheme or artifice to defraud" that involves the mail or wires in interstate commerce, while Section 1346 defines a "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, which encompasses "schemes . . . involving bribes and kickbacks." <u>Skilling v. United States</u>, 130 S. Ct. 2896, 2907 (2010). The relevant federal bribery statute, Section 666(a)(2), criminalizes "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward an agent of . . . a State . . . government, or any agency thereof, in connection with any business, transaction, or series of transactions of such . . . government[] or agency." Lastly, 18 U.S.C. § 1952(a)(1) & (3) prohibits, among other things, use of interstate mail facilities to "distribute the proceeds" or "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on[] of any unlawful activity"—here, activity violating New York Public Officers Law § 73(5)(a), which prohibits persons from offering to members of the State legislature "any gift having more than a nominal value . . . under circumstances in which it could reasonably be inferred that the gift was intended to influence him, or could reasonably be expected to influence him, in the performance of his official duties or was intended as a reward for any official action on his part."

1    unclear, (2) the New York State Public Officers Law permitted the consulting contracts, and (3)

2    the legislators engaged in routine official acts.

3         "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal

4    offense with sufficient definiteness that ordinary people can understand what conduct is

5    prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."

6    United States v. Morrison, 686 F.3d 94, 103 (2d Cir. 2012) (quotation marks omitted); see

7    Skilling v. United States, 130 S. Ct. 2896, 2927-28 (2010).  The doctrine "addresses concerns

8    about (1) fair notice and (2) arbitrary and discriminatory prosecutions." Skilling, 130 S. Ct. at

9    2933.  Although a law has to provide "minimal guidelines" in the form of "explicit standards"

10    regarding what conduct is unlawful, "it need not achieve meticulous specificity, which would

11    come at the cost of flexibility and reasonable breadth." Mannix v. Phillips, 619 F.3d 187, 197

12    (2d Cir. 2010) (quotation marks omitted).  The need for flexibility is especially important in the

13    context of criminal laws aimed at public corruption.  In determining whether a statute satisfies

14    the "fair notice" prong, we ask "whether the statute, either standing alone or as construed, made

15    it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. (quotation

16    marks omitted).

17         A.  Quid Pro Quo Agreements

18         Here, each of the crimes of conviction could be proven by evidence of an illegal quid pro

19    quo agreement, which we have previously defined as "a government official's receipt of a

20    benefit in exchange for an act he has performed, or promised to perform, in the exercise of his

21    official authority." United States v. Ganim, 510 F.3d 134, 141 (2d Cir. 2007); see N.Y. Pub. Off.

22    Law  § 73(5)(a) (prohibiting exchanges intended to influence a state legislator in his official

13

1   duties).  To establish the "'corrupt' intent necessary to a bribery conviction," the Government

2   must prove that the defendant had "'a specific intent to give . . . something of value in exchange

3   for an official act,'" United States v. Alfisi, 308 F.3d 144, 149 (2d Cir. 2002) (emphasis in

4   original) (quoting United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 404-05 (1999)),

5   which generally includes any act taken "under color of official authority," Ganim, 510 F.3d at

6   142 n.4.  We have made it crystal clear that the federal bribery and honest services fraud statutes

7   that Rosen was convicted of violating criminalize "scheme[s] involving payments at regular

8   intervals in exchange for specific official[] acts as the opportunities to commit those acts arise,"

9   even if "the opportunity to undertake the requested act has not arisen," id. at 147, and even if the

10  payment is not exchanged for a particular act but given with the expectation that the official will

11  "exercise particular kinds of influence," United States v. Coyne, 4 F.3d 100, 114 (2d Cir. 1993).

12  "Once the quid pro quo has been established, . . . the specific transactions comprising the illegal

13  scheme need not match up this for that."  Ganim, 510 F.3d at 147.

14          With these principles in mind, we conclude that Rosen had notice that paying State

15  legislators to take official action on his or MediSys's behalf as the opportunities for those actions

16  arose was plainly unlawful.  Here, the boundaries of the "as opportunities arise" theory are well

17  established, and Rosen's conduct was clearly unlawful under the statutes that he was convicted

18  of violating.  Indeed, "it has always been as plain as a pikestaff that bribes and kickbacks" are

19  prohibited.  Skilling, 130 S. Ct. at 2933 (quotation marks omitted).  The illegality of an "as

20  opportunities arise" quid pro quo agreement has been established in this Circuit for more than

21  two decades.  See Coyne, 4 F.3d at 113-14.  And, critically, the requirement that the Government

22  prove a defendant's specific intent to bribe eliminates the possibility that he will be prosecuted

14

1    for bribery without fair notice.  See Skilling, 130 S. Ct. at 2933.  We therefore reject Rosen's

2    vagueness challenge to the extent he attacks the "as opportunities arise" theory as a general

3    matter.

4                   B.  New York State Public Officers Law

5         More specifically, we reject Rosen's argument that he lacked fair notice that his activities

6    were unlawful because the consulting agreements with Seminerio were authorized by the New

7    York State Public Officers Law.  To be sure, the Public Officers Law permits members of the

8    State Legislature, whose elected positions are technically part-time, to maintain outside

9    employment.  But the same statute also clearly prohibits legislators from doing what Rosen

10    understood Seminerio was doing, namely, accepting compensation for services related to State

11    legislative activity or matters before any State agency, see N.Y. Pub. Off. Law § 73(2), (7), or

12    accepting anything of more than nominal value "under circumstances in which it could

13    reasonably be inferred that the gift was intended to influence him . . . in the performance of his

14    official duties or was intended as a reward for any official action," id. § 73(5)(a).  Similarly,

15    New York's code of conduct for public officers provides that "[n]o . . . member of the legislature

16    . . . should accept other employment which will impair his independence of judgment in the

17    exercise of his official duties."  Id. § 74(3)(a).

18         Rosen asserts that the NHP-MARC and Jamaica Hospital-MARC consulting agreements

19    were lawful because they called for Seminerio to consult only on non-State matters.  Both

20    contracts explicitly stated that MARC "shall not provide any consulting services in respect of

21    any unit or agency of the State of New York, including the state legislature," and it may well be

22    true that consulting services provided in accordance with the agreements would have been lawful

1    under the Public Officers Law.  Having determined that Rosen bribed Seminerio "to help the

2    MediSys hospitals obtain or attempt to obtain important <u>state</u> funding" (emphasis added),

3    however, the District Court properly rejected Rosen's urged conclusion and explicitly found that

4    the agreements were a sham intended to provide a "plausible 'cover' for the bribes."  It also

5    found that Rosen entered into the quid pro quo agreements "with a specific intent to bribe the

6    legislators," making clear that Rosen acted with the requisite mens rea.  <u>See</u> <u>Skilling</u>, 130 S. Ct.

7    at 2933.  Although Rosen insists that this finding was clearly erroneous, we disagree.  Based on

8    the trial record, we cannot say that the District Court's factual finding of specific intent to bribe a

9    legislator in exchange for illegal conduct in violation of the Public Officers Law constituted clear

10    error.  We therefore reject the void-for-vagueness challenge to Rosen's convictions relating to

11    Seminerio.

12           In urging a contrary conclusion, Rosen argues that, where state law might be regarded as

13    permitting at least part of a defendant's conduct, we should repudiate the Government's "as

14    opportunities arise" theory of prosecution and require proof of an <u>explicit</u> promise to perform

15    official acts in exchange for the promised benefit.  Outside the unique context of campaign

16    contributions, <u>see</u> <u>McCormick v. United States</u>, 500 U.S. 257, 273 (1991), we have not, in the

17    context of bribery cases, required proof of an express promise regarding the specific official acts

18    to be undertaken as part of the exchange.  For one thing, our reluctance to require such proof is

19    consistent with providing the Government significant flexibility in its efforts to prosecute

20    political corruption.  It also reflects our view that "donors and recipients engaged in ongoing

21    bribery schemes do not always spell out in advance the specific match between gift and act."

22    <u>Ganim</u>, 510 F.3d at 148.  For that reason, we have held that "[a] promise to perform such acts as

1  the opportunities arise is sufficient," United States v. Bruno, 661 F.3d 733, 744 (2d Cir. 2011)

2  (quotation marks omitted), and the existence of such an agreement "may be implied from the

3  [defendant's] words and actions," Ganim, 510 F.3d at 143.  We decline Rosen's invitation to

4  expand McCormick by requiring proof of an express promise in this case.  See United States v.

5  Garcia, 992 F.2d 409, 414 (2d Cir. 1993).

6                         C.  Routine Official Acts

7          Rosen also contends that he lacked fair notice that his conduct was illegal because we

8  have sanctioned the "as opportunities arise" theory of quid pro quo bribery only in cases

9  involving intrinsically corrupt acts, not routine legislative acts that are consistent with the

10  interests of the official's constituents.  We disagree.  Payments to State legislators may constitute

11  bribes even if the legislator's resulting actions are otherwise "routine"—such as voting in a

12  certain manner or supporting grants to certain businesses.  Indeed, Rosen acknowledged at oral

13  argument that State officials are not permitted to receive compensation to influence a vote.  Tr.

14  of Oral Arg. at 5.  Moreover, the corrupt intent that is central to an illegal quid pro quo exchange

15  persists even though the State legislator's acts also benefit constituents other than the defendant.

16              2.  Sufficiency of the Evidence

17          We turn next to Rosen's argument that there was insufficient evidence that he acted with

18  the specific intent to enter into illegal quid pro quo arrangements with Seminerio, Boyland, and

19  Kruger.  In considering the argument, we keep in mind that "[a] defendant who challenges the

20  sufficiency of the evidence after a conviction bears a heavy burden, and we view the evidence in

21  the light most favorable to the prosecution."  United States v. Litwok, 678 F.3d 208, 213 (2d Cir.

22  2012) (quotation marks, citation, and alteration omitted).  Under this "exceedingly deferential

17

1    standard, we will affirm the conviction if <u>any</u> rational trier of fact could have found the essential

2    elements of the crime beyond a reasonable doubt." <u>Id.</u> (emphasis in original) (quotation marks

3    and citation omitted).

4        A.  <u>Seminerio</u>

5        Rosen contends that the evidence relating to Seminerio "equally or nearly equally"

6    supports a finding that Rosen's intent was to pay Seminerio to obtain consulting services relating

7    to non-State matters.  In cases involving public officials, a trier of fact may "infer guilt from

8    evidence of benefits received and subsequent favorable treatment, as well as from behavior

9    indicating consciousness of guilt." <u>Bruno</u>, 661 F.3d at 744 (quotation marks omitted).  We have

10   never required direct evidence of the quid pro quo.  "Indeed, evidence of a corrupt agreement in

11   bribery cases is usually circumstantial, because bribes are seldom accompanied by written

12   contracts, receipts or public declarations of intentions." <u>United States v. Friedman</u>, 854 F.2d

13   535, 554 (2d Cir. 1988).

14       Having reviewed the trial evidence with these standards in mind, we conclude, for at least

15   three reasons, that a reasonable trier of fact could find that Rosen intended to enter into an

16   arrangement to pay Seminerio sham consulting fees in exchange for Seminerio's commitment to

17   assist MediSys in his official capacity as specific opportunities arose.  First, communications

18   between Seminerio and Rosen repeatedly tied the consulting payments to Seminerio's use of his

19   official influence at the State level with high-ranking State government officials like the

20   Governor and Senate Majority Leader.  Second, the District Court could rationally infer from the

21   undisputed evidence of the importance of State funding to MediSys that Rosen's principal

22   motive for maintaining a relationship with Seminerio was to secure State benefits.  Third,

1    Rosen's failure to disclose the consulting agreements evidenced either (1) a deliberate attempt to

2    conceal a corrupt relationship with Seminerio, or (2) consciousness of guilt that, while alone "is

3    insufficient proof on which to convict where other evidence of guilt is weak," "[t]aken together

4    . . . [with] all of the evidence marshaled at trial," Litwok, 678 F.3d at 214, reinforces the District

5    Court's finding of specific intent and supports Rosen's conviction, see Bruno, 661 F.3d at 744.

6         Rosen also argues that he relied on the advice of counsel when executing the Seminerio

7    consulting agreements.  Specifically, he asserts that the contracts were drafted by counsel, and

8    that Kalkines informed him that the LEC had approved the contracts.  Because Kalkines did not

9    testify, the only evidence that Rosen was told that the LEC had approved the contracts came

10   from two MediSys employees, who testified that Rosen had told them he was so informed.  The

11   District Court was entitled either to disbelieve the testimony of these employees or credit their

12   testimony but infer that Rosen had lied to them.  See Krist v. Kolombos Rest. Inc., 688 F.3d 89,

13   95 (2d Cir. 2012).  Here, the District Court found that Rosen never actually intended to enter into

14   a legitimate consulting agreement with Seminerio.  In summary, sufficient evidence existed to

15   convict Rosen with respect to Seminerio.

16         B.  Boyland

17         Pointing to the role and influence of Boyland's family in local politics and the relevant

18   community, Rosen attempts to portray the payments to Boyland as efforts to generate goodwill,

19   not bribes in exchange for official acts.  In advancing this argument, Rosen relies on Ganim, in

20   which we appear to have distinguished efforts to obtain generalized goodwill without corrupt

21   intent from efforts to engage in quid pro quo bribery.  510 F.3d at 149.  We reject the argument.

22

19

1      "[I]t is the requirement of an <u>intent</u> to perform an act in <u>exchange</u> for a benefit—i.e., the

2      quid pro quo agreement—that distinguishes [extortion and bribery] from . . . legal and illegal

3      gratuities." <u>Id.</u> at 146-47 (emphasis added).  To prove that the payments to Boyland constituted

4      bribes, and not gratuities or legal lobbying, the Government adduced the following evidence: (1)

5      the payments to Boyland were structured as monthly consulting payments as opposed to one-off

6      gifts or honorariums, <u>cf.</u> <u>United States v. Sun-Diamond Growers of Cal.</u>, 526 U.S. 398, 406-07

7      (1999) (describing various "token gifts" as examples of acceptable gratuities that should not be

8      criminalized); (2) the payments to Boyland totaled more than $175,000, far exceeding what

9      might reasonably be expected for a gratuity; (3) Rosen began paying Boyland as a consultant

10     within one year of Boyland's election to the State Assembly, <u>Bruno</u>, 661 F.3d at 744 (holding

11     that close temporal relationship could support finding of quid pro quo); (4) Boyland sought State

12     funding for Brookdale Hospital within months of the initial payment; (5) Boyland requested

13     $3,000,000 in the State budget on behalf of Jamaica Hospital, which was not located in his

14     Assembly district; and (6) Rosen failed fully to disclose the payments to Boyland on required

15     disclosure forms.

16          Based on this and other evidence, the District Court found that Rosen acted with the

17     requisite intent to bribe Boyland, not just to obtain his goodwill.  As was the case with

18     Seminerio, we are hard pressed to say that the court's finding of intent with respect to Rosen's

19     arrangement with Boyland is clearly erroneous.  We therefore hold that there was sufficient

20     evidence of Rosen's agreement to pay Boyland in exchange for Boyland's commitment to assist

21     MediSys by performing official acts as the opportunities arose, in violation of the federal bribery

22     and honest services fraud statutes.

1          C. <u>Kruger</u>

2          There was also sufficient evidence that Rosen specifically intended to enter into a corrupt

3    agreement to approve the Compassionate Care contract in exchange for Kruger's help or

4    commitment to help MediSys at the State level, and not merely to get Kruger's generalized

5    goodwill.  For example, on the same day that Rosen learned that Kruger had obtained two

6    equipment grants worth $425,000 for MediSys hospitals, Rosen told Kruger that he was

7    "coordinating [the] contract" and that he had not forgotten him.  In addition, there was no

8    evidence that the contract had any legitimate business purpose for MediSys.

9          D. <u>Other Arguments</u>

10          Rosen claims that the official acts that Seminerio, Boyland, and Kruger took simply

11    mirrored their prior support for MediSys, and that they would have continued to advance

12    MediSys's interests without any payment.  Although it has no basis in the record in connection

13    with Boyland and Kruger, the claim is not completely implausible as it relates to Seminerio.

14    Nevertheless, the District Court, as the trier of fact in a position to assess the evidence and the

15    credibility of witnesses, could and did reject this argument and determine instead that the

16    payments to Seminerio were intended to <u>ensure</u> that MediSys continued to receive his support.

17          Pointing to the lapse of time between the payments to the three legislators, including

18    Seminerio, and their official acts, Rosen also argues that those acts were not linked to any

19    benefits from MediSys.  The lapse of time between the payments to Boyland and Kruger and

20    their official acts was, in context, virtually negligible, and we easily reject Rosen's argument as

21    to them.  We also reject the argument as it relates to Seminerio.  Although Rosen focuses on

22    Seminerio's official acts that occurred some six years after the consulting contracts were signed,

1    the argument ignores evidence of at least two acts that were considerably closer in time to the

2    execution of the contracts: (1) Seminerio sent the March 1999 letter to the Senate Majority

3    Leader to restore funding to the hospital indigent care pool; and (2) in April 1999, the day the

4    Jamaica Hospital-MARC contract was signed, Seminerio called Rosen to say that he was having

5    dinner with the Governor and to see how he could help MediSys.

6         3.  Witness Immunity

7         Finally, we address Rosen's contention that the District Court erred when it denied his

8    motion for an order compelling the Government to provide his former counsel, Kalkines, with

9    immunity so that he could be compelled to testify.  We review a district court's denial of a

10   motion to compel the Government to immunize a defense witness for abuse of discretion.  See

11   United States v. Ebbers, 458 F.3d 110, 118 (2d Cir. 2006).  The Government may be required to

12   provide such immunity only under exceptional circumstances, where: (1) the Government "has

13   engaged in discriminatory use of immunity to gain a tactical advantage or, through its own

14   overreaching, has forced the witness to invoke the Fifth Amendment," and (2) "the witness'

15   testimony will be material, exculpatory and not cumulative and is not obtainable from any other

16   source."  United States v. Skelly, 442 F.3d 94, 101 (2d Cir. 2006) (quotation marks and

17   alteration omitted); see United States v. Ferguson, 676 F.3d 260, 291 (2d Cir. 2011).

18        The District Court did not abuse its discretion when it concluded that Rosen had failed to

19   demonstrate that this case represented an exceptional circumstance that warrants compelling the

20   the Government to immunize a witness.  First, the court made the undisputed finding that

21   Kalkines was "at a very minimum, . . . prosecutable for tax evasion arising out of the same

22   general bundle of events . . . that are involved in this case."  The Government may reasonably

22

1  refuse to grant immunity where a witness is a potential target of criminal prosecution.  United

2  States v. Turkish, 623 F.2d 769, 778 (2d Cir. 1980).  Second, Rosen admitted to the District

3  Court that he "ha[dn't] proffered anything that . . . Kalkines [said] because . . . Kalkines . . .

4  won't talk to the government, [and] he won't talk to me," and Rosen did not otherwise show that

5  Kalkines's testimony would be "material, exculpatory, and unobtainable from other sources."

6  United States v. Todaro, 744 F.2d 5, 9 (2d Cir. 1984) (affirming denial of motion for defense

7  witness immunity where defense counsel's affidavit provided insufficient indication of the

8  witness's expected testimony).  Accordingly, we affirm the District Court's ruling on the issue of

9  witness immunity.

10                                                  **CONCLUSION**

11

12            For the foregoing reasons, we AFFIRM the judgment of the District Court.

13

14

15

16